**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHARMAINE A. THOMPSON, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| JO ANNE E. BARNHART, | : | |
| COMMISSIONER OF SOCIAL SECURITY | : | |
| Defendant | : | NO. 05-395 |

## MEMORANDUM AND ORDER

Gene E.K. Pratter                                                March 15, 2006

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3), to review the

Commissioner's partially favorable decision on Plaintiff's claim for disability insurance benefits

(DIB) and supplemental security income (SSI) under Titles II and XVI, respectively, of the

Social Security Act (Act), 42 U.S.C. §§ 401-433, 1381-1383f.  Having reviewed the underlying

record, the Plaintiff's Motion for Summary Judgment, the Plaintiff's Opposed Findings, the

Plaintiff's Reply Brief, the Defendant's Cross Motion for Summary Judgment, the Defendant's

Opposition to the Plaintiff's Opposed Findings, the Report and Recommendation from the

Magistrate Judge, and the Plaintiff's Objections thereto, this Court has determined that the case

must be remanded pursuant to sentence four of 42 U.S.C. § 405(g) because this Court cannot say

the ALJ's November 9, 2004 decision was supported by substantial evidence or that the ALJ

applied the correct legal standards.

## I.      BACKGROUND

### A.      Procedural History

Plaintiff, Ms. Charmaine Thompson, applied for DIB and SSI on November 6, 1998, alleging disability since September 29, 1989, because of neck problems, discomfort in her right eye and right arm, and high blood pressure.  (Administrative Record (herein R.) 274-76, 319, 708-09).  The state agency initially denied Plaintiff's applications and reaffirmed that denial on reconsideration.  (R. 56-59, 87-88, 92-95, 698-707).  On May 23, 2000, following two hearings (R. 96-211),  Administrative Law Judge (ALJ) Jonathan L. Wesner issued a decision[1] on Plaintiff's DIB and SSI claims (R. 212-36), which the Appeals Council upheld.  (R. 239-42).  Plaintiff then appealed to this Court on June 27, 2002.  Thompson v. Barnhart, No. 02-4151.  On March 17, 2003, after considering the Commissioner's unopposed motion to remand, Judge Dalzell granted the motion and remanded the case for further administrative proceedings.  (R. 245-48).

On July 16, 2000, Plaintiff filed a subsequent SSI application.  (R. 9, 64, 250).  ALJ William F. Curtain approved this claim on September 8, 2003, finding that Ms. Thompson was disabled as of July 16, 2000.  (R. 64-66, 250).  Thereafter, on March 23, 2004, the Appeals Council directed the ALJ to conduct a hearing on the earlier DIB and SSI claims which had been remanded by Judge Dalzell.  (R. 249-50).  The Appeals Council also ordered the ALJ to "consider [the September 8, 2003] decision if necessary consistent with the applicable reopening regulations."  (R. 250).  On remand, the ALJ held a hearing on September 14, 2004, at which Plaintiff testified while represented by counsel.  A medical expert and a vocational expert also testified. (R. 19-55).

---

[1]    The ALJ had proposed to compromise Plaintiff's DIB and SSI claims, suggesting that she be categorized as disabled as of December 1, 1998.  (R. 133-43).  Plaintiff apparently declined the ALJ's settlement offer.

On November 9, 2004, ALJ Gerlad J. Spitz issued a decision partially favorable to Ms. Thompson which is now before this Court.[2]  (R. 6-18).  ALJ Spitz determined that ALJ Curtin's September 8, 2003 decision that Plaintiff was disabled as of July 16, 2000 should stand as the "final determination of the Administration for the period of July 16, 2000, through the present date."  (R. 9).  The ALJ further decided that prior to July 16, 2000, Plaintiff could perform a significant number of jobs that accommodate her specific functional limitations.  (R. 10-17). The ALJ thus concluded that Plaintiff was "disabled" within the meaning of the Act after July 16, 2000, but not prior thereto.  (R. 6-18).  This appeal followed.  Presently before the Court is the Plaintiff's Motion for Summary Judgment, the Plaintiff's Opposed Findings, the Plaintiff's Reply Brief, the Defendant's Cross Motion for Summary Judgment, the Defendant's Opposition to the Plaintiff's Opposed Findings, the Report and Recommendation from the Magistrate Judge, and the Plaintiff's Objections thereto.

**B.    Factual History**

Plaintiff was 49 years old at the time of ALJ Spitz's November 9, 2004 decision.  (R. 39, 274).  Ms. Thompson graduated from high school (R. 39, 325) and has worked as a nurse's assistant.  (R. 99, 310).  She last worked on September 29, 1989, when she sustained a work-related injury to her right arm (R.102-03, 560) and her disability insured status expired on December 31, 1994.  (R. 277).[3]

**1.    Ms. Thompson's Medical Record**

---

[2]    Plaintiff was not required to seek Appeals Council review of the ALJ's November 2004 partially favorable decision.  <u>See</u> 20 C.F.R. § 416.1484.  (R. 19-55).

[3]    In order to be entitled to DIB, a claimant must demonstrate that she was disabled before the expiration of her disability insured status.  <u>See</u> 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. § 404.131(a) (2004); <u>Matullo v. Bowen</u>, 926 F.2d 240, 244 (3d Cir. 1990).

### a.     Treatment for Physical Ailments

#### i.     Initial Treatment

The record indicates that Plaintiff received initial treatment for her work-related right arm injury until January 11, 1990, when her physician released her to full duty as of February 1, 1990.  (R. 357).  Lewis S. Sharps, M.D., an orthopedic surgeon, saw Ms. Thompson on two occasions in 1991 at the request of the Office of Workers' Compensation Programs ("OWCP"). On June 21, 1991, she complained of pain radiating along the medial aspect of her right arm, and of occasional neck discomfort.  (R. 465).  The doctor's observation was recorded as possible right carpal tunnel syndrome, and that cervical disc syndrome could not be excluded.  (R. 465). On July 26, 1991, Dr. Sharps determined there was some improvement of symptoms to the extent that Ms. Thompson could "return to work to a moderate-type of position with a 30 pound weight restriction."  (R. 463-66).

#### ii.     Richard G. Traiman, M.D.

Ms. Thompson began treatment with Richard G. Traiman, M.D. in September 1991 when she related a two-year history of right arm pain.   After conducting an examination and reviewing x-rays, Dr. Traiman diagnosed Ms. Thompson with possible cervical radiculopathy. He recommended continued Naprosyn.  (R. 438).  His diagnosis was confirmed when an electromyogram ("EMG") on October 10 indicated cervical radiculopathy.  At that time Ms. Thompson had pain in the right side of her neck and in her right shoulder, running down the right arm and Dr. Traiman provided her with a cervical collar.  (R. 437).

A cervical spine magnetic resonance imaging ("MRI") scan on November 7, 1991, showed findings consistent with muscle spasm and mild degenerative disc disease.  (R. 459).  By November 18, 1991 Ms. Thomson had responded quite well to physical therapy and reported

4

about 80 percent improvement even though there was slight residual tenderness in her right trapezius.  On February 4, 1992 Rene Perez, a physical therapist, reported to Dr. Traiman that the results of a Functional Capacity Evaluation indicated no restriction with regards to sitting, standing or walking and that lifting 20 pounds could be tolerated on an occasional basis "which can be interpolated to no greater than 10 lbs. on a frequent basis."  (R. 455-458).  The physical therapist concluded that Ms. Thompson's greatest deficit was poor tolerance to frequent overhead and forward reaching which was "tolerable for only a few short minutes," and further that repetitive fine motor work while her arms were at shoulder height was tolerable for only 12 minutes, while squatting was tolerable only on an occasional basis.  (R. 455).  Mr. Perez recommended a six to eight week work hardening program "to improve her tolerances towards a full work day at a LIGHT physical demand classification."  She attended rehabilitation for six days but stopped, stating she had been told to discontinue by OWCP.  (R. 453).

On January 14, 1993, Ms. Thompson reported three episodes of right neck and shoulder pain.  Dr. Traiman's examination revealed spasm and tenderness of the right trapezius and posterior cervical regions, and some loss of motion.  He recommended Naprosyn and physical therapy.  (R. 436).  Physical therapist, John Spangenberg, reported to Dr. Traiman that on January 27 Ms. Thompson had experienced an exacerbation of her symptoms and tenderness of the right upper trapezius with radiation of pain to the right shoulder and elbow.  Mr. Spangenberg recommended resumption of physical therapy.  (R. 447-52).  On February 4, 1993, Ms. Thompson wished to continue physical therapy because her pain in the right neck and shoulder had improved.  On February 25 she reported 80-90 percent overall reduction of her neck pain.  Dr. Traiman recommended home exercises and intermittent use of a cervical collar.  (R. 435).

Mr. Spangenberg reported to Dr. Traiman again on March 5, 1993 having administered a number of questionnaires, which were negative for symptom magnification, above average for anxiety/depression and high for psychological distress due to pain.  In job simulations, she was able to perform data entry for 100 minutes with minimal symptoms and cosmetology for 37 1/2 minutes with minimal symptoms.  Mr. Spangenberg apparently thought that a work hardening program might be beneficial.  (R. 443-46).  Dr. Traiman saw Ms. Thompson again in September, 1993 because she complained of occasional paresthesia in her right arm.  (R. 435).  In March, 1994 she complained of exacerbation of neck and right shoulder pain associated with spasms, and Dr. Traiman noted that there was some grip weakness and generalized weakness of her entire right arm.  (R. 435).  Dr. Traiman recommended home cervical traction.  An April 1994 EMG showed mild to moderate C6-7 involvement on her right side consistent with her symptoms.  (R. 435).  Ms. Thompson had also been using a traction apparatus at home with 50-75 percent overall improvement and Dr. Traiman noted that she was looking for employment. (R. 435).

On October 7, 1999,  an MRI report prepared for Dr. Traiman demonstrated "mild" degenerative disc changes in Plaintiff's mid to lower cervical spine.  (R. 544).  Two weeks later, on October 21, 1999, Plaintiff's EMG "show[ed] only chronic radiculopathy, nothing acute." (R. 542).  In May 1999 Dr. Traiman recommended excisional biopsy of a chronic painful mass of the right forearm that had not responded to conservative treatment.  (R. 510, 543).  Ms. Thompson underwent surgery on August 20, 1999 to remove the mass from her right forearm. (R. 549-50).  On September 27 the wound was healing, but there were pain and paresthesias in the right hand.  X-rays showed spondylitic changes in her neck and her neck motion was limited. On October 21, Dr. Traiman prescribed physical therapy, including traction, for her neck.  On

November 11, Dr. Traiman concluded that the physical therapy had failed, that her symptoms

had been going on for ten years, and that the prognosis was very poor.  (R. 542, 511-16).

Finally, Ms. Thompson received physical therapy again in June, July and August 2001.  She

reported a slight decrease in her right arm pain but no substantial change in her tolerance for

daily activities.  (R. 669-84).  Then, on August 23, 2001 Dr. Traiman noted that Ms. Thompson

had persistent right arm pain.  He gave her an injection for recurrent medial epichondylitis and

noted there was fullness and tenderness of the right trapezius indicating a possible mass.  (R.

689).

### iii.     R. J. Kreb, III, M.D.

On September 16, 1991, an EMG examination of Plaintiff's right arm conducted by R. J.

Kreb, III, M.D. revealed "some minimal" root irritation at C6-C7 distribution on the right side

(R. 366) but her nerve conduction studies were normal.  (R. 366).  Based on these diagnostic

tests, Dr. Kreb stated that it was unlikely that Plaintiff had a cervical disc herniation.  (R. 366).

On March 31, 1994, an EMG of Plaintiff's right arm demonstrated "minimal to moderate"

chronic root irritation at C6-C7 on the right side (R. 369) and the nerve conduction studies of her

right arm were normal.  (R. 369).  Dr. Kreb remarked that "the overall findings are fairly

compatible to her previous study of 1991 without any significant changes at this time."  (Tr.

369).

### iv.     Daniel L. Zimet, M.D.

On August 25, 1997, Daniel L. Zimet, M.D., an orthopedist, received an EMG and nerve

conduction study of Plaintiff's right arm which suggested findings of an ulnar neuroplaxia of the

right ulner nerve at the right cubital tunnel, as well as chronic right-sided C5 or C6

7

radiculopathy.  (R. 387-88).  On September 11, 1997, Dr. Zimet examined Plaintiff and reported

that she should consider performing light or sedentary work on an ongoing basis.  (R. 380).  He

also observed some tenderness in the right shoulder and slight tenderness in the right forearm.

Dr. Zimet reviewed radiological studies including a November 1991 cervical MRI which showed

muscle spasm and mild degenerative disc disease.  (R. 380).  He thought that the cubital tunnel

syndrome was unlikely to respond to conservative treatment and that the probability of

successful surgery was not high.  He thought that sedentary or light work would be appropriate.

(R. 380).  Dr. Zimet saw Ms. Thompson again on May 22, 2001 and reported diagnoses of C5, 6

radiculopathy, ulnar neuropathy, and a partial thickness tear of the right rotator cuff.  He did not

think that surgery was necessary.  (R. 688).

### v.      Kevin A. Mansmann, M.D.

Kevin A. Mansmann, M.D., an orthopedic surgeon, saw Ms. Thompson on December 28,

1994.  She had been complaining of constant aching from the right upper shoulder to below the

elbow, pain on the right side of her neck, and occasional tingling in her fingers.  Dr.

Mansmann's diagnosis indicated a sprain/strain of the cervical spine.  He said that objective

findings did not substantiate her complaints, and that she could return to work, performing light

duty initially and progressing as tolerated to full duties.  (R. 354-56).

On December 5, 1997, Dr. Mansmann, evaluated Plaintiff for her complaints of right

hand discomfort and found that Plaintiff could perform a 95% range of motion with her cervical

spine and a full range of motion with both of her shoulders.  (R. 358-60).  She had normal motor

strength and sensation in her upper extremities.  (R. 359).  There was no evidence of atrophy in

her right hand.  (R. 359).  Dr. Mansmann concluded that Ms. Thompson had a resolved cervical

sprain and strain with a right-sided C5-C6 chronic radiculopathy and right ulnar neuropathy.  (R. 359).  In Dr. Mansmann's opinion, Plaintiff could return to light work duty status.  He also believed that she retained the ability to lift up to twenty pounds with her right arm, but Dr. Mansmann restricted Plaintiff from using her right arm repetitively.  (R. 360).

On June 29, 1998, Dr. Mansmann reported that Plaintiff was taking medication for her complaints of neck pain radiating to her right arm, however, "she has not had any physical therapy in the past four to five years."  (R. 347).  Dr. Mansmann's impression was cervical radiculopathy and ulnar neuropathy.  (R. 347).

### vi.    Strasburg Family Associates

Notes from Strasburg Family Associates show that in November 1998, Ms. Thompson complained of arm and neck pain.  She said that the medications were no longer working and her pain was constant.  The notes also indicate her right grip strength was diminished and that deep tendon reflexes were decreased in her right arm.  (R. 560).  In early December 1998, she felt "a little achy, but okay," and she complained of recurrent stiffness in her neck and shoulder.  (R. 561).

### vii.    Melvin Gerber, D.O

Melvin Gerber, D.O., performed electrodiagnostic studies on November 24, 1998.  Ms. Thompson complained of pain, numbness and tingling involving her entire right arm.  Dr. Gerber interpreted the studies as consistent with very mild bilateral carpal tunnel syndrome and not compatible with cervical radiculopathy, polyneuropathy or myopathy.  He also noted that radial pulses were significantly reduced bilaterally, more so on the right, and commented that

Ms. Thompson's arm symptoms could relate to arterial vascular insufficiency.  (R. 426-431,

564).

### viii.    Human Services

X-rays of the neck, upper back, and shoulder taken by Human Services on December 10,

1998 showed cervical straightening consistent with muscle splinting.  They also showed mild

narrowing at C4-5 and C5-6 with small calcifications anterior to disc spaces at those levels and

indicated that the right shoulder was normal.  (R. 551-52, 565-66).

### ix.    Non-Examining State Agency Medical Consultants

A non-examining state agency medical consultant completed physical residual functional

capacity assessment forms on December 16, 1998.  The consultant indicated that, both currently

and as of her date last insured, Ms. Thompson could lift 50 pounds occasionally and 25 pounds

frequently with unlimited ability to push/pull, she could climb a ramp or stairs occasionally, but

should avoid concentrated exposure to extreme cold, wetness, and vibration.  (R. 410-25).

Again, on March 11, 1999, a non-examining state agency medical consultant completed a

physical residual functional capacity assessment form also indicating that Ms. Thompson could

lift 50 pounds occasionally and 25 pounds frequently with unlimited ability to push/pull.  (R.

499-506).

### x.    W. C. Atkinson Community Health Center

Ms. Thompson received further routine medical care at the W. C. Atkinson Community

Health Center in 1999.  Her weight in that year ranged from 202 to 206 pounds.  In June she

complained of left shoulder pain.  She stated that her arm had given out while picking up a

roasting pan.  Health Center reports stated there was point tenderness of the left anterior aspect

of the shoulder but she had a full range of motion with occasional pain, likely indicating bursitis of the left shoulder.  (R. 517-22).

### xi.    Emergency Room Treatment

Ms. Thompson received emergency room treatment on November 12, 1999 because of a swollen right arm.  The clinical impression was degenerative joint disease with radiculopathy. (R. 586-91).  She received emergency room treatment again in April 2001 because of right arm pain and right leg pain after lifting bags of soil.  (R. 666-68).  A later MRI of the right shoulder on May 10, 2001 suggested a partial tear of the supraspinatus tendon.  (R. 691).

### b.    Treatment for Psychological Ailments

### i.    Florence Super, B.S.

On December 20, 1990, Plaintiff visited a community mental health center because she was having difficulty with an abusive relationship and was evaluated by Florence Super, B.S. (R. 473-74).  There was no evidence of a thought disorder.  (R. 474).  It was suggested that Plaintiff undergo individual outpatient therapy.

### ii.    George Adams, M.D.

Plaintiff returned to the community mental health center approximately seven years later, on December 1, 1998.  (R. 471).  According to the intake summary, Plaintiff had a history of dysthymia, but she had not received any mental health treatment since 1991 and she was not taking any psychiatric medications, but she was consuming alcohol to self-medicate her psychological condition.  (R. 471-72).

On December 9, 1998, Plaintiff saw George Adams, M.D., for a psychiatric evaluation. (R. 475-76).  On examination, Dr. Adams observed that Plaintiff complained of depression,

11

however, her affect was "up beat." (R. 476). Dr. Adams advised Plaintiff to stop drinking alcohol, as it affected her psychological problems. (R. 476). Dr. Adams diagnosed dysthymia, alcohol abuse, and adjustment disorder with depressed mood. (R. 476). Dr. Adams believed that Plaintiff's Global Assessment of Functioning (GAF) was fifty. (R. 476).[4]

### iii.        James A. Barrett, Ph.D.

On March 11, 1999, James A. Barrett, Ph.D., a non-examining state agency medical consultant completed psychiatric review technique forms and concluded that Plaintiff had no severe mental impairment. (R. 481, 490). In Dr. Barrett's opinion, Plaintiff had "slight" restriction of activities of daily living, "slight" difficulties in maintaining social functioning, she "seldom" had deficiencies of concentration, persistence, or pace and she "never" had episodes of deterioration or decompensation in work-like settings. (R. 488).

### iv.        Human Services

---

[4]    Psychiatrists and Psychologists classify mental disorders along a diagnostic system consisting of five axes. American Psychiatric Association, The Diagnostic Manual of Mental Disorders, (DSM-IV) 32 (4th ed. 1994). The GAF rating scale, the fifth axis to assess how well the individual is able to function in her environment, considers psychological, social, and occupational functioning on a continuum of mental health to mental illness. A GAF score varies from 0-100 according to the severity of the mental illness. An individual with a score ranging between 0-10 is deemed to be a persistent danger of hurting herself and cannot maintain standard of self-care, while an individual with a score from 91-100 is deemed to be happy, healthy and content. A score of 41-50 indicates serious symptoms (suicidal ideation but low risk) and a serious impairment in one analyzed area. A score of 51-60 indicates the individual suffers from moderate symptoms in most analyzed areas. An individual with a score between 61-70 suffers mild symptoms and is able to function with some problems in relationships and work.

Drejka v. Barnhart, No. 01-587, 2002 U.S. Dist. LEXIS 7802 (D. Del. Apr. 18, 2002).

Ms. Thompson received therapy from Human Services in 1999, 2000, and 2001 and was treated with medication.  In February, 1999 she complained of insomnia.  In April she stated she was sluggish and tired.  She complained again about insomnia and depression in May.  (R. 555).  She continued to have anxiety, but by August her medication was "very effective to relieve her depression."  However, in September she reported severe insomnia since her surgery and Human Services noted she "may need crisis residential."  (R. 554).   Her symptoms seemed to improve in 2000.  But in April 2001 she was noted as withdrawn at times even though on May 18, 2001, a progress note states that Plaintiff had "good anti-depressant benefits" from her prescribed medications.  (R. 594-599).

### v.      Richard W. Cohen, M.D.

At the September, 2004 hearing, Richard W. Cohen., M.D., a psychiatrist, testified as a medical expert.  Dr. Cohen testified that Plaintiff's medical records supported a diagnosis of dysthymia.  (R. 27).  Dr. Cohen further testified that dysthymia "is a mild depression, not a major psychiatric problem" (R. 27), and that "[i]t is important to understand that dysthymic disorder is a mild depression . . . not a severe depression."  (R. 30).  Dr. Cohen also diagnosed an alcohol dependancy, explaining that "a part of this dysthymia may be the alcohol, which is a substance-induced mood disorder."  (R. 28).

In Dr. Cohen's opinion, Plaintiff's psychological condition did not rise to the level of a severe or listing level impairment.  According to Dr. Cohen, Plaintiff's activities of daily living were mildly impaired.  (R. 28).  Dr. Cohen observed that Plaintiff's activities of daily living included caring for her mentally retarded child, cooking full meals, cleaning, and driving an automobile.  (R. 28).  Dr. Cohen further opined that Plaintiff's social functioning and

13

concentration, persistence, and pace were mildly impaired and that she had no episodes of deterioration. (R. 28-29). Finally, according to Dr. Cohen, GAF assessments should not be granted much weight because vary they among practitioners, and "what somebody might call a 50, somebody [else] might call a sixty." (R. 32).

### 2. Vocational Expert Testimony

At the September 2004 hearing, the ALJ posed a hypothetical question to the vocational expert, Lee Levin, to determine whether Plaintiff could perform other work in the national economy. (R. 40-41). He asked the expert to consider an individual who lived in Chester County, had a high school education, could perform light work except for being unable to frequently reach overhead or forward. The expert responded that there were several light jobs that would be suitable, including flagger in construction and office messenger. She also stated that sedentary work would not be suitable because sedentary jobs require reaching forward. (R. 40-41). During questioning by counsel, the vocational expert explained that while the flagger job did not "require excessive amounts of focus or attention," one would still have to be aware of her surroundings. (R. 43).

### 3. Ms. Thompson's Testimony

Plaintiff testified that during the period from 1989 to 1999 her life was very depressing. She stated there were some days where she would stay in bed watching television getting up only to go to the bathroom. She explained that she was injured in 1989 while working at a Veterans Administration Medical Center when a patient fell on her arm, snapping it backwards. She said something just popped in her neck and arm and after that she experienced pain every day. She testified that she has limited motion of her right hand and uses her left hand a lot. She stated that

her right hand would hurt if she used it to pick up something or carry it.  She said just taking a

shower was "a task" for her.  She denied abusing pills or alcohol.  (R. 45-51).

## II.   DISCUSSION

### A.   Standard of Review

#### 1.   The Commissioner's Decision

The scope of the Court's review of the Commissioner's decision is limited to determining

whether the Commissioner applied the correct legal standards and whether the record, as a

whole, contains substantial evidence to support the Commissioner's findings of fact.  Schaudeck

v. Commissioner of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).

"Substantial evidence 'does not mean a large or considerable amount of evidence, but

rather such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (quoting Pierce v.

Underwood, 487 U.S. 552, 565, 101 L. Ed. 2d 490, 108 S. Ct. 2541 (1988)); see also Plummer v.

Apfel, 186 F.3d 422, 427 (3d Cir. 1999) (noting that "substantial evidence" has been defined as

"more than a mere scintilla").  "The court cannot conduct de novo review of the Commissioner's

decision or re-weigh the evidence of record."  Palmer v. Apfel, 995 F. Supp. 549, 552 (E.D. Pa.

1998).

#### 2.   The Magistrate Judge's Report and Recommendation

The Court does, however, undertake de novo review of those portions of the Magistrate

Judge's Report and Recommendation to which Ms. Thompson has objected.  See 28 U.S.C. §

636(b)(1)(C).  Therefore, the Court "may accept, reject or modify, in whole or in part, the

findings and recommendations made by the magistrate."  Id.

### B.      Social Security Law

In order to establish a disability under the Social Security Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Stunkard v. Secretary of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988) (quoting Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987)); 42 U.S.C. § 423(d)(1)(A).  A claimant is considered unable to engage in any substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

The Social Security Administration ("SSA") has promulgated regulations incorporating a five-step sequential evaluation process for determining whether a claimant is under a disability. See 20 C.F.R. § 404.1520; Williams v. Sullivan, 970 F.2d 1178, 1180 (3d Cir. 1992).  The Commissioner evaluates each case according to the five-step process until a finding of "disabled" or "not disabled" is made.  Schaudeck v. Commissioner of SSA, 181 F.3d 429, 431 (3d Cir. 1999).  The five steps should be followed in sequence:

> (1) [I]f the claimant is currently engaged in substantial gainful employment, she will be found not disabled; (2) if the claimant does not suffer from a "severe impairment," she will be found not disabled; (3) if a severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last continually for at least twelve months, then the claimant will be found disabled; (4) if the severe impairment does not meet prong (3), the Commissioner considers the claimant's residual functional capacity ("RFC") to determine whether she can perform work she has done in the past despite the severe impairment - if she can, she will be found not disabled; and (5) if the claimant cannot perform her past work, the Commissioner will consider the

16

claimant's RFC, age, education, and past work experience to determine whether she can perform other work which exists in the national economy.

Schaudeck, at 431-32 (citing § 404.1520(b)-(f)).

Here ALJ Spitz determined that while Plaintiff was not engaged in gainful activity, her impairments did not equal any listings under the regulations and that although Ms. Thompson was unable perform her past relevant work as a nurse's assistant, there was a significant number of jobs in the national economy which she could have performed. (R.16-17).

### C.   Plaintiff's Objections to Magistrate Judge's Report and Recommendations

The Report and Recommendation concludes that the Commissioner's Motion for Summary Judgment should be granted because Ms. Thompson's "argument essentially ignores the issues of the earlier ALJ's holding regarding re-opening the pre-2000 claim . . . ." Report and Recommendation at 6. This conclusion appears to be based on the Magistrate's judgment that ALJ Curtin's decision on September 8, 2003 not to reopen the same claim that is now before this Court, also precludes this Court from reviewing the claim. ALJ Curtin stated in his September 8, 2003 decision that:

> The prior decision of another Administrative Law Judge dated May 23, 2000, cannot be reopened pursuant to 20 C.F.R. 416.1488(b), as this Administrative Law Judge does not find the evidence submitted in connection with the current application is both new and material to the period before May 23, 2000.

(R. 65).

Ms. Thompson, however, argued in her objections to the Magistrate's Report and Recommendation that this Court does have jurisdiction to review the claim before this Court because it constitutes "a direct and timely appeal of a final administrative decision that is clearly proper under 42 U.S.C. § 405(g)." Obj. to the Report and Recommendation at 5. Ms. Thompson

17

is correct.  Ms. Thompson primarily argues that the September 8, 2003 determination not to re-open her claim could not apply to her claim because her claim had been remanded and was awaiting action from the Appeals Council when ALJ Curtin made his September 8, 2003 decision.  The merit of this argument need not be addressed because Ms. Thompson has also correctly identified the fact that even if the September 8, 2003 decision not to re-open the case is binding, the actual ALJ decision of November 9, 2004 that is before this Court for review today constitutes a de facto reopening of the case.

"Even if a prior determination was not explicitly reopened, we may find that a de facto reopening has occurred."  Kaszer v. Massanari, 40 Fed. Appx. 686, 692 (3d Cir. Jul. 19, 2002). "[W]here the administrative process does not address an earlier decision, but instead reviews the entire record in the new proceeding and reaches a decision on the merits, the agency has effectively reopened the prior claims and waived application of res judicata."  Kane v. Heckler, 776 F.2d 1130, 1132 (3d Cir. 1985) (citing  Purter v. Heckler, 771 F.2d 682, 695 (3d Cir. 1985)). Concerning whether a prior decision had been addressed, the court in Kaszer held that "the agency must address whether the prior adjudication will be used for its preclusive effect or whether it will be reopened," and if it does not apply the prior adjudication for its res judicata effects, then a case can be considered re-opened if the ALJ reviewed the entire record in the new proceeding and reached a decision on the merits.  Kaszer, 40 Fed. Appx. at 693-694.

While ALJ Spitz, in the November 9, 2004 decision, "determined that the decision issued on September 8, 2003, should stand as the final determination of the Administration for the period of July 16, 2000 through the present date," he also identified the fact that the earlier ALJ decision of May 23, 2000 had been remanded to him with instructions to "give further

consideration to the claimant's mental impairment, re-evaluate the claimant's maximum residual functional capacity, and obtain vocational expert testimony."  (R.9).[5]   Rather than applying the the May 23, 2000 decision for any preclusive effect, "[a]fter carefully considering the entire record," ALJ Spitz rendered a decision on the merits concerning the period prior to July 16, 2000.  (R. 16).  Therefore, ALJ Spitz's November 9, 2004 decision constituted a de facto re-opening of the May 23, 2000 ALJ decision, even though it is not even clear that a "re-opening" of the May 23, 2000 decision is procedurally required in order for the November 9, 2004 ALJ decision to be properly before this Court.   Thus, this Court has jurisdiction to review the November 9, 2004 ALJ decision to determine if the factual issues were supported by substantial evidence and to determine if the ALJ made any legal error.  This Court will now do so.

> **D.    The ALJ Decision**

Ms. Thompson argues in her motion for summary judgment that the ALJ (1) failed to comply with the remand order, (2) did not properly assess Ms. Thompson's mental limitations, (3) did not properly address the date of the disability onset, and (4) rejected Ms. Thompson's testimony without good reason.

> **1.    The Remand Order**

As Ms. Thompson points out, when her claim was previously litigated in Civil Action No. 02-4151, the Commissioner moved for remand stating "this case would benefit from further administrative proceedings, including obtaining a mental status evaluation and a medical source statement regarding what Plaintiff can do despite her impairments."  (R. 246-47).  The district

---

[5]   ALJ Spitz mistakenly referred to the December 20, 1999 decision as opposed to the May 23, 2000 decision.  ALJ Wesner held a hearing on December 20, 1999, prior to his May 23, 2000 decision.

19

court then remanded the case for "further proceedings consistent with defendant's motion." (R. 245).  Subsequently, the Appeals Council remanded the case instructing the ALJ to, *inter alia*, "obtain a mental status examination and medical source statement about what the claimant can do despite her impairments . . . ." (R. 249-50).  Ms. Thompson argues that the ALJ did not obtain a psychiatric or psychological consultative examination or obtain a proper "medical source statement."  Ms. Thompson contends that the documentary medical evidence added to the record since the remand consists of records of two emergency room visits, records of physical therapy and electrodiagnostic studies, notes from two physicians, and some radiological reports, but that there no mental status examination occurred and no medical source statement was made.

The Commissioner argues that the ALJ, consistent with the remand order, obtained psychiatric medical expert testimony from Dr. Cohen, a psychiatrist.  (R. 26-39).  The Commissioner also contends that while "Dr. Cohen did not examine Plaintiff, Dr. Cohen reviewed all of her medical records and provided testimony about the nature and severity of her psychological condition."  Def.'s Cross Mot. For Summary Judgment at 17.  Furthermore, the Commissioner argues that "Dr. Cohen also provided the ALJ with a medical source statement, testifying about the degree of limitations arising from her non-severe mental impairment."  Id.

Ms. Thompson has correctly stated that failure to adhere to the court's remand order in the subsequent administrative proceedings is itself legal error, citing Hooper v. Heckler, 752 F. 2d 83, 88 (4th Cir. 1985) and Mefford v. Gardner, 383 F. 2d 748, 758-759 (6th Cir. 1967).  The Supreme Court of the United States has also referred to these same cases in recognizing that "deviation from the court's remand order in the subsequent administrative proceedings is itself

20

legal error, subject to reversal on further judicial review." <u>Sullivan v. Hudson</u>, 490 U.S. 877, 886 (1989).   The court in <u>Mefford</u> explained the general rule that:

> [O]n the remand of a case after appeal, it is the duty of the lower court, or the agency from which appeal is taken, to comply with the mandate of the court and to obey the directions therein without variation and without departing from such directions; and that after a cause has been determined on appeal, the court or agency from which the appeal is taken is without power to open or modify the judgment or order of the appellate court, or to alter or relieve from the precise fulfillment of a specified condition on which the effect of the appellate judgment is made to depend. Moreover, if the cause is remanded with specific directions, further proceedings in the trial court or agency from which appeal is taken must be in substantial compliance with such directions; and if the cause is remanded for a specified purpose, any proceedings inconsistent therewith is error . . . .

<u>Mefford</u>, 383 F.2d at 758 (citation omitted).

Even prior to the Supreme Court's recognition of this principle, this District had rejected at least once a decision of an ALJ because the ALJ's finding was "clearly inconsistent with this court's remand order and represents error." <u>Thompson v. Schweiker</u>, No. 82-4901, 1985 U.S. Dist. LEXIS 16860 (E.D. Pa. Aug. 14, 1985) (citing <u>Hooper v. Heckler</u>, 752 F.2d 83, 88 (4th Cir. 1985); <u>Mefford v. Gardner</u>, 383 F.2d 748, 758 (6th Cir. 1967)).

Furthermore, the Social Security Administration's own regulations call for adherence to the remand orders of the Appeals Council stating that the "administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b).  Here, the District Court judge remanded the case for "further proceedings consistent with defendant's motion" (R. 245) (the motion itself stating "this case would benefit from further administrative proceedings, including obtaining a mental status evaluation and a medical source statement regarding what Plaintiff can do despite her impairment" (R. 246)),  and the Appeals Council

21

instructed the ALJ to, *inter alia*, "obtain a mental status examination and medical source statement about what the claimant can do despite her impairments." (R. 249-50). However, by the Commissioner's own admission, "Dr. Cohen did not examine Plaintiff" but only reviewed her medical records and provided testimony about the nature and severity of her psychological condition. Def.'s Cross Motion for Summary Judgment at 17. Additionally, although the Commissioner contends that Dr. Cohen did in fact provide a medical source statement, the Plaintiff correctly argued that "[m]edical source statements are to be based on the medical sources' records <u>and examination</u> of the individual; i.e., their personal knowledge of the individual." SSR 96-5p, 1996 SSR LEXIS 2, at *11 (emphasis added).

The ALJ has, therefore, committed legal error by not following the mandate of the court, and by not following the regulations of the Social Security Administration itself which require adherence to the remand orders of the Appeals Council.[6] Thus, on this basis the case shall be remanded to the ALJ who will ensure the claimant obtains a proper mental status examination and medical source statement concerning what the claimant was capable of doing despite her impairments.

### 2.   The ALJ's Assessment of Ms. Thompson's Mental Limitations

### a.   Dr. Adams' Diagnosis and GAF Rating

Ms. Thompson argues that the ALJ erred by summarizing the documentary evidence of record from Human Services, Inc., without mentioning the Global Assessment of Functioning ("GAF") rating recorded by Dr. George Adams. When summarizing the evidence relating to

---

[6]   "Social Security Rulings 'are binding on all components of the Social Security Administration.'" <u>Walton v. Halter</u>, 243 F.3d 703, 708 (3d Cir. 2001) (quoting 20 C.F.R. § 402.35(b)(1)).

Ms. Thompson's alleged mental impairments, the ALJ stated that Dr. Adams evaluated Ms.

Thompson in 1990, recommending individual therapy and medication.  (R. 10).  Then, in

describing the next documented treatment for any possible mental impairments the ALJ stated

that "treatment notes from therapy sessions from 1999 to 2001 do not document significant

symptoms or limitations related to her mental impairments.  Rather, it appears claimant's

symptoms were well controlled with medication."  (R. 10-11).  However, Ms. Thompson points

out that there was no acknowledgment or discussion of evidence inconsistent with the ALJ's

conclusions.

Dr. Adams examined Ms. Thompson on December 9, 1998 and reported psychiatric

diagnoses of dysthymia, alcohol abuse, and adjustment disorder with depressed mood, and also

reported that Ms. Thompson had a GAF of 50.  (R. 476).   As mentioned above, a GAF in the

range of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals,

frequent shoplifting) or any serious impairment in social, occupational, or school functioning

(e.g., no friends, unable to keep a job).  Honig v. Barnhart, No. 04-2068, 2005 U.S. Dist. LEXIS

8626, at *12-13 (E.D. Pa. Mar. 23, 2005) (citing DSM-IV at 32).  Ms. Thompson argues that a

GAF score of 50 is clearly inconsistent with the ALJ's finding that Ms. Thompson's mental

impairment is "non-severe," noting that the "severe" impairment standard of the Social Security

Regulations is a minimal one.  McCrea v. Barnhart, 370 F.3d 357, 362 (3d Cir. 2004).  Ms.

Thompson argues that the degree of impairment indicated by a GAF of 50 is far more than

minimal.

The Commissioner responds by arguing that although Dr. Adams believed that Plaintiff's

GAF was 50 (R. 476), Dr. Richard Cohen testified at the September 14, 2004 hearing that GAF

assessments are not reliable indicators of mental functioning because they vary among practitioners since "what somebody might call a 50, somebody [else] might call a 60." (R. 32-33).  While this response may in fact be true, the ALJ did not include that same critique of GAF scores in his decision, and this Court can only review the decision on the basis upon which it was made.  Fargnoli v. Halter, 247 F.3d 34, 43-44 n.7 (3d Cir. 2001) ("the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.") (quoting SEC v. Chenery Corporation, 318 U.S. 80, 87 (1943)).

Ms. Thompson maintains that the ALJ erred both in finding that her impairment was non-severe and in failing to consider the GAF evidence.  While the Court rejects Ms. Thompson's invitation to re-weigh the evidence, the Court does accept her contention that the ALJ erred by not explaining in his decision how the GAF evidence was evaluated.  "Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."  Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981).

Other courts in this District have come to identical conclusions concerning GAF evidence.  In Span v. Barnhart, No. 02-7399, 2004 U.S. Dist. LEXIS 12221, at *21-23 (E.D. Pa. May 21, 2004) the court remanded a case because the ALJ failed to adequately explain how or why he discounted the significance of plaintiff's GAF scores.  Additionally, the court in Escardille v. Barnhart, No. 02-2930, 2003 U.S. Dist. LEXIS 11085, at *20-22 (E.D. Pa. June 24, 2003), remanded a case to the ALJ because the ALJ entirely failed to evaluate a physician's report indicating that the plaintiff had a GAF score of 50.  Here, although the ALJ cited the

24

exhibit which contained the GAF score, because the ALJ failed to adequately explain how he evaluated the GAF evidence, this Court cannot say that the ALJ's decision was supported by substantial evidence. Therefore, on remand the ALJ must specifically address this evidence.

**b.     The Inclusion of Limitations in the RFC Assessment**

Ms. Thompson also contends that the ALJ erred by relying on testimony elicited by a hypothetical question which did not include all of Ms. Thompson's limitations. Ms. Thompson argues that the ALJ found that she had non-severe affective and substance abuse disorders resulting in mild restriction of daily activities, difficulties maintaining social functioning and infrequent deficiencies in concentration, persistence or pace, and that these limitations should have been included in the hypothetical questioning. The Commissioner argues that in response to the ALJ's hypothetical question, the vocational expert identified unskilled work which did not "require excessive amounts of focus or attention" (R. 40-41, 43) and that this effectively accommodates any limitations arising from Plaintiff's non-severe mental impairment. But Ms. Thompson objects to this response by arguing that the expert only addressed this limitation in reference to the flagger job. She points out that the expert also said "for the flagger job . . . it's critical that there be attention to avoid accidents at the construction site." (R. 42). Further, the vocational expert agreed with Ms. Thompson's counsel when he stated that "there are significant hazards around with construction vehicles and moving traffic and angry drivers who have to wait, things like that, so you have to pay attention to all those things." (R. 43). But in response to the question by Ms. Thompson's counsel "You have to have a pretty good ability to focus on things?" the expert said:

> I would say no. This is an unskilled job. You have to be aware of your surroundings, yes. You cannot be comatose. But you -- it doesn't require excessive amounts of focus or attention or else it wouldn't be a level 2.

(R. 43).

Nevertheless, when evaluating a claimant's mental impairment or impairments, an ALJ is obliged to rate the claimant's degree of limitation in four broad areas of functioning. The four areas are activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). The ALJ addressed these areas in his November 9, 2004 decision stating "[s]ince the late 1990's, the claimant has suffered from nonsevere affective and substance addiction disorders, resulting in mild restriction of activities of daily living, difficulties in maintaining social functioning and seldom causing deficiencies of concentration, persistence, or pace." (R. 16). The ALJ also found, with respect to the period from September 29, 1989 to July 15, 2000, that Ms. Thompson was restricted to light work that did not require frequent reaching overhead or forward. (R.16). However, during the hearing, the ALJ asked the vocational expert the following:

> [When considering an individual] living in Chester County with a high school education, who was found to have the residual functional capacity for a limited range of light work and was found to have the capacity to lift and carry 20 pounds occasionally, ten pounds frequently, sit for eight hours in an eight-hour workday, stand and walk for eight hours in an eight-hour workday. However, with a limitation of being unable to frequently reach overhead or forward. With that limitation, what types of jobs, if any, would you identify as having existed in the regional or national economy with Chester County being the focus of the center-point of the region -- or another region, perhaps -- in the years that I mentioned?

(R. 40).

In questioning a vocational expert, the hypothetical question must include all of a claimant's impairments that are supported by the record. Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004). In Ramirez, when reviewing the hypothetical question asked by the ALJ, the court concluded that "[w]e are not satisfied that these limitations take into account the ALJ's

26

own observation . . . that Ramirez *often* suffered from deficiencies in concentration, persistence, or pace." Ramirez, at 554.  In Burns v. Barnhart, 312 F.3d 113, 122-23 (3d Cir. 2002), the Third Circuit Court of Appeals could not conclude that the ALJ's ruling was supported by substantial evidence because the vocational expert's testimony did not touch on borderline intellectual functioning, and the ALJ used only the concept of "simple repetitive one-, two-step tasks" in the hypothetical.  The court determined that the reference to simple tasks did not "specifically convey" the claimant's intellectual limitations and that "greater specificity" was required.

Here, in questioning the expert, the ALJ omitted some of the limitations he found to exist and was supposed to consider under the remand instructions.  The Appeals Council specifically ordered the taking of "evidence from a vocational expert to clarify the effect of the assessed limitations (physical and mental)."  (R. 250) (emphasis added).  But the ALJ did not include any mental limitations in his hypothetical question.  The follow-up questioning by counsel for Ms. Thompson does seem to have alleviated this error to a degree, at least in reference to the flagger job, and Ms. Thompson's deficiencies in concentration were *seldom* as opposed to *often* like the claimant in Ramirez.  But inasmuch as the ALJ failed to include in his question the mental impairments of Ms. Thompson that he had identified in his decision, he failed to include all of the claimant's impairments that are supported by the record.  Therefore, the ALJ must now on remand elicit testimony regarding those impairments by incorporating them into a hypothetical question posed to a vocational expert.

### 3.    Problematic Onset Date

Finally, Ms. Thompson argues after affirming the September 8, 2003 determination that she was disabled as of July 16, 2000, the ALJ failed to consult a medical expert to determine

when she became disabled in accordance with Social Security Regulation 83-20.[7]  Ms.

Thompson argues that ALJ Curtin's determination on September 8, 2003 that Ms. Thompson

"has been disabled since at least since July 16, 2000," (R. 64) did not constitute a determination

that Ms. Thompson was not disabled before that date.  As she points out, nothing medically

relevant happened on July 16, 2000.  That date was the onset date only because SSI benefits are

not retroactive, and July 16, 2000 was the earliest date the ALJ could have awarded benefits

because that was the protective filing date of the application.  20 C.F.R. § 416.335; (R. 9, 64).

The Commissioner responds by arguing that the ALJ in this case did not determine that Plaintiff

was disabled as of July 16, 2000, but only evaluated whether to reopen the Commissioner's

September 2003 decision that Plaintiff was disabled as of July 16, 2000.  (R. 9).  The

Commissioner argues that the "ALJ, in his discretion, determined that there were no grounds for

reopening the previous September 2003 decision that Plaintiff had been disabled since July 16,

2003.  If Plaintiff believed that she had an earlier onset of disability, she should have appealed

the Commissioner's September 2003 decision."  Def.'s Cross-Motion for Summary Judgment at

21.

Social Security Regulation 83-20 provides an analytical framework for determining a

disability onset date.  SSR 83-20 defines the "onset date of disability" as "the first day an

individual is disabled as defined in the Act and the regulations."  Beasich v. Comm'r of Soc.

---

[7]    The claimant also devoted a portion of her brief to the argument that an alleged "settlement offer" of benefits beginning in December 1, 1998 from the ALJ in the original hearing before Judge Wesner in 2000 should be proof that an impairment existed.  Then she intimates that she has been the object of retaliation for not accepting this offer.  Aside from being inappropriate, this argument is also irrelevant, in that it is the decision of ALJ Spitz in 2004 that is before this Court for review, not the initial decision of Judge Wesner.

Sec., No. 02-3627, 66 Fed. Appx. 419, 432 (3d Cir. June 6, 2003).[8]  Additionally, Social Security

Ruling 83-20 provides, in relevant part:

> In addition to determining that an individual is disabled, the decision maker must also establish the onset date of disability. In many claims, the onset date is critical; it may affect the period for which the individual can be paid and may even be determinative of whether the individual is entitled to or eligible for any benefits.

1983 SSR LEXIS 25, at *1.

"In cases in which the onset date is critical to a determination of entitlement to benefits,

an ALJ must grapple with and adjudicate the question of onset, however difficult."  Newell v.

Comm'r of Soc. Sec., 347 F.3d 541, 548 (3d Cir. 2003).  Furthermore, "[a]n earlier onset date

assessment is mandated when a claimant already has been found disabled and alleges an earlier

disability onset date."  Beasich, at 432.  In Beasich, the claimant, at the age of 30, had applied

for both SSI benefits and disabled adult child's benefits based on alleged impairments as a result

of a head injury sustained at age 14.  The SSI claim had been awarded because the SSA found

that the claimant had a psychiatric and neurological condition as a result of the head injury and

that his current psychiatric condition impacted on his ability to maintain concentration and had

prevented him from engaging in work activity from August 1, 1996.  But inasmuch as there was

insufficient information in the record to determine his condition between the ages of 18 to 22

years, the SSA denied his claim for disabled adult child's benefits.  Therefore, the claimant

---

[8]    Under SSR 83-20, 1983 SSR LEXIS 25, at *3, an ALJ should consider three factors in determining an onset date: (1) the claimant's allegations; (2) the claimant's work history; and (3) medical and other evidence.  Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 548 at n.6 (3d Cir. 2003).

argued *inter alia* that the ALJ had failed to apply SSR 83-20. <u>Id.</u> at 432. In response to this argument, the court held:

> There was no dispute that, in the context of a separate application for SSI benefits, the claimant was determined to have been "disabled" as of August 1, 1996, by his psychiatric condition that was the result of his head injury in 1981. In view of that earlier SSI disability finding, the task of the ALJ in the context here was to determine onset -- i.e., when Beasich's impairments first became disabling.

<u>Id.</u>

In <u>Walton v. Halter</u>, 243 F.3d 703, 708 (3d Cir. 2001), as in <u>Beasich</u>, a claimant receiving SSI benefits needed to establish a remote onset date in order to receive child's disability insurance benefits predicated on his deceased father's employment record, and the court of appeals remanded the case directing the ALJ to determine an onset date consistent with SSR 83-20. <u>Walton</u>, 243 F.3d at 710. Additionally, in <u>Fulton v. Barnhart</u>, No. 02-1261, 2003 U.S. Dist. LEXIS 4930, at *11-12 (E.D. Pa. Mar. 4, 2003), when the Commissioner argued that the finding of disability must be based on the same application that was currently under review and not based on a finding of disability contained in a subsequent application, the court stated "we agree with plaintiff that <u>Walton</u> controls here" and remanded the case to determine the proper onset date.

Most recently, in <u>Payton v. Barnhart</u>, No. 05-4494, 2006 U.S. Dist. LEXIS 7046, at *5-7, 12-13 (E.D. Pa. Feb. 24, 2006), the ALJ issued a partially favorable decision, finding that plaintiff's depression was a severe impairment after October 1, 2001, but not for the period between June 1, 2000 and September 30, 2001, and the court reversed the ALJ's decision holding the medical evidence of record suggested that plaintiff had suffered the same impairments from her depression before October 1, 2001 as after.

30

Here, the ALJ has "determined that the decision issued on September 8, 2003, should stand as the final determination of the Administration for the period of July 16, 2000, through the present date."  (R. 9).  The September 8, 2003 decision found that Ms. Thompson was in fact disabled as of July 16, 2000 apparently based only on the fact that July 16, 2000 was the date the application was filed.  The ALJ impliedly acknowledged this reality by his statement in the September 8, 2003 decision that Ms. Thompson was disabled "at least" back to July 16, 2000. Ms. Thompson is now left in the awkward position where the Social Security Administration has on one hand identified that she is disabled, but on the other hand determined that the disability began on a date significant for no other reason than the fact that she filed a piece of paper on that day.  The application of Social Security Regulation 83-20 would alleviate this incongruity. Therefore, it is incumbent upon the Commissioner to determine when Ms. Thompson's disability began.

On remand the ALJ shall apply SSR 83-20 in establishing the onset date of Ms. Thompson's disabilities.  When determining the onset date, the ALJ must review the medical evidence, and determine if clear evidence allows him to select a reasonable disability onset date. This Court also notes that inasmusch as this may be a case involving a slowly progressive impairment, where the medical evidence regarding the onset date of the disability is ambiguous and the ALJ must infer the onset date, "SSR 83-20 and the substantial evidence rule dictate . . . that an ALJ in a situation of this kind must call upon the services of a medical advisor rather than rely on his own lay analysis of the evidence."  Walton v. Halter, 243 F.3d 703, 709 (3d Cir. 2001).

## III.   CONCLUSION[9]

For the foregoing reasons, the Court grants Ms. Thompson's Motion for Summary Judgment to the extent that the matter is remanded for further evaluation consistent with this Memorandum and denies the Commissioner's Motion for Summary Judgment.  An appropriate Order consistent with this Memorandum follows.

BY THE COURT:


S/Gene E.K. Pratter

GENE E. K. PRATTER

UNITED STATES DISTRICT JUDGE

---

[9]    The Plaintiff also disputes the credibility determinations made by the ALJ concerning Ms. Thompson's testimony.  Credibility determinations by an ALJ need only be supported by substantial evidence on the record as a whole,  Wilson v. Apfel, No. 98-5611, 1999 U.S. Dist. LEXIS 16712, at *11 (E.D. Pa. Oct. 29, 1999) (citing Miller v. Commissioner of Soc. Sec., 172 F.3d 303, 304 n.1 (3d Cir. 1999)), and when the ALJ weighs the credibility of the claimant's testimony against other evidence in the record as seems to be the circumstances here, the Court must defer to the factfinder.  Alvarez v. Secretary of Health & Human Services, 549 F. Supp. 897, 900 (E.D. Pa. 1982) (citations omitted).  However, the Court will not address this argument inasmuch as the case is already being remanded on other grounds which may or may not have an impact upon the underlying credibility analysis.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHARMAINE A. THOMPSON, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| JO ANNE E. BARNHART, | : | |
| COMMISSIONER OF SOCIAL SECURITY | : | |
| Defendant | : | NO. 05-395 |

**ORDER**

Gene E.K. Pratter                                                                           March 15, 2006

AND NOW, this day the 15th of March, 2006, upon consideration of the Plaintiff's

Motion for Summary Judgment, the Plaintiff's Opposed Findings, the Plaintiff's Reply Brief, the

Defendant's Cross Motion for Summary Judgment, the Defendant's Opposition to the Plaintiff's

Opposed Findings, the Report and Recommendation from the Magistrate Judge, and the

Plaintiff's Objections thereto, (Docket Nos. 10, 13, 14, 17, 18, 21 and 22),  **IT IS HEREBY**

**ORDERED** that:

1.      The Report and Recommendation is **NOT ADOPTED**;

2.      The Motion for Summary Judgment filed by plaintiff is **GRANTED** to the extent that the matter is remanded for further evaluation consistent with this Memorandum and Order.

3.      The Motion for Summary Judgment filed by the Commissioner is **DENIED**.

BY THE COURT:

S/Gene E.K. Pratter
GENE E. K. PRATTER
UNITED STATES DISTRICT JUDGE